UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

In re:                                            :

FLAG TELECOM HOLDINGS LIMITED, FLAG LIMITED, FLAG   :
PACIFIC USA LIMITED, FLAG TELECOM GROUP SERVICES
LIMITED, FLAG TELECOM USA LTD., FLAG ASIA LIMITED, FLAG :
ATLANTIC HOLDINGS LIMITED, FLAG ATLANTIC LIMITED,    :
FLAG ATLANTIC USA LIMITED                            :          05 Civ. 05724 (NRB)
                                                    :
                                                    :
-------------------------------------------------- x

FLAG TELECOM GROUP LIMITED, FLAG ASIA LIMITED, FLAG   :
TELECOM ASIA LIMITED, FLAG TELECOM TAIWAN             :
LIMITED and FLAG TELECOM JAPAN LIMITED               :

                    Plaintiffs-Appellees-Cross-Appellants,    :

            v.                                          :

KENSINGTON INTERNATIONAL, LTD., SPRINGFIELD ,        :
ASSOCIATES, LLC, ELLIOTT ASSOCIATES, L.P. and ELLIOTT :
INTERNATIONAL, L.P.,                                 :

                    Defendants-Appellants-Cross-       :
                    Appellees.                         :

WILMINGTON TRUST COMPANY and THE BANK OF NEW          :
YORK,                                                 :
                                                    :
                    Defendants-Appellee.              :
                                                    :
-------------------------------------------------- x

BRIEF OF DEFENDANTS-APPELLANTS KENSINGTON
INTERNATIONAL, LTD., SPRINGFIELD ASSOCIATES, LLC,
ELLIOTT ASSOCIATES, L.P. and ELLIOTT INTERNATIONAL, L.P.

                    KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
                    551 Fifth Avenue
                    New York, New York 10176
                    (212) 986-6000

                    Attorney for Defendants-Appellants
                    KENSINGTON INTERNATIONAL, LTD., SPRINGFIELD
                    ASSOCIATES, LLC, ELLIOTT ASSOCIATES, L.P., and
                    ELLIOTT INTERNATIONAL, L.P.

Of Counsel:
    David Parker
    Edward P. Grosz

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

Preliminary Statement.................................................................................................... 1

Statement of Appellate Jurisdiction .............................................................................. 2

Statement of Issues Presented ....................................................................................... 3

Standard of Review......................................................................................................... 4

Statement of the Case..................................................................................................... 4

The Alcatel Note ............................................................................................................. 5

The Indenture and the Indenture Notes.......................................................................... 7

The Course of the Proceedings ...................................................................................... 9

The Memorandum of Decision and Judgment................................................................ 14

Statement of Facts.......................................................................................................... 16

A.    FLAG's Obligations to Perfect The Security Interest in the Taiwan Collateral................ 18

B.    FLAG Breaches its Obligation to Perfect the Security Interest
      In the Taiwan Collateral........................................................................................... 22

C.    Taiwan Law, Regulations and Practice Governing the Perfection of
      Security Interests...................................................................................................... 26

D.    The Errors of the Memorandum of Decision Below .............................................. 27

Argument ........................................................................................................................ 33

POINT I      FLAG'S FAILURE TO PERFECT THE SECURITY INTEREST IN THE
             TAIWAN COLLATERAL IS NOT EXCUSED BY THE DOCTRINE OF
             LEGAL IMPOSSIBILITY.................................................................................. 33

POINT II     EVEN IF FLAG WERE OBLIGED TO COMPLY WITH ONLY NEW YORK
             LAW, THE NEW YORK UCC REQUIRED FLAG TO PERFECT THE
             SECURITY INTEREST IN ACCORDANCE WITH THE LAWS OF IN
             TAIWAN ......................................................................................................... 38

Conclusion ..................................................................................................................... 42

## TABLE OF AUTHORITIES

### Cases

*407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275 (1968)............................. 35

*Bank of America Nat'l Trust and Savings Assoc. v. Envases Venezolanos, S.A.*, 740 F. Supp. 260 (S.D.N.Y.), *aff'd*, 923 F.2d 843 (2d Cir. 1990) ....................................................................... 35

*City of New York v. Local 333, Marine Division, Int'l Longshoreman's Assoc.*, 79 A.D.2d 410 (1st Dep't 1981), *aff'd*, 55 N.Y.2d 898 (1982) ..................................................................... 35

*Comprehensive Bldg. Contractors, Inc. v. Pollard Excavating, Inc.*, 251 A.D.2d 951 (3d Dep't 1998) ....................................................................................................................... 34

*Frenchman & Sweet, Inc. v. Philco Discount Corp.*, 21 A.D.2d 180 (4th Dep't 1964) ............... 35

*In re Ionosphere Clubs Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990), *cert. denied*, 502 U.S. 808 (1991)................................................................................................................................... 4

*In re T.R. Acquisition Corp.*, 309 B.R. 830, 835 (S.D.N.Y. 2003) ............................................. 4

*In the Matter of A&S Transp. Co. v. County of Nassau*, 154 A.D.2d 456 (2d Dep't 1989) ......... 35

*Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 208 A.D.2d 1073 (3d Dep't 1994) ................................................................................................................................. 35

*Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900 (1987) ............................................... 34

*Lagarenne v. Ingber*, 273 A.D.2d 735 (3d Dep't 2000) .......................................................... 34

*Morin v. Frontier Bus. Technologies*, 288 B.R. 663, 668-669 (W.D.N.Y. 2003) ........................ 4

*Navila v. Windsor Wolf Road Properties Co.*, 249 A.D.2d 658 (3d Dep't 1998) ....................... 35

*T.E.A.M. Entertainment, Inc. v. Douglas*, 361 F. Supp. 2d 362, 367 (S.D.N.Y. 2005)............... 33

*VJK Prods., Inc. v. Friedman/Myer Prods., Inc.*, 565 F. Supp. 916 (S.D.N.Y. 1983) ................ 35

### Statutes

28 U.S.C. § 158(a) ................................................................................................................. 2

N.Y. UCC § 9-307(c)............................................................................................................ 20

### Secondary Sources

14 *Corbin on Contracts*, § 74.1, p. 9 (2001) ........................................................................ 37

Restatement (Second) of Contracts § 266 (1981) (emphasis added)........................................ 37

## Preliminary Statement

At issue in this case is whether a Chapter 11 debtor-in-possession should be required to comply with its post-petition contractual obligations. The United States Bankruptcy Court for the Southern District of New York (Gropper, U.S.B.J.) granted summary judgment to Plaintiffs-Appellees, holding, incorrectly, that it was legally impossible, under Taiwan law, for Plaintiffs-Appellees to fulfill their contractual obligation to perfect a security interest in collateral located in Taiwan (the "Taiwan Collateral"). In reaching this conclusion, the Bankruptcy Court committed plain error. It is undisputed that, in order to perfect the security interest in the Taiwan Collateral, Plaintiffs-Appellees would have had to locate a Taiwan individual or entity willing to act as collateral agent and willing to register the security interest with the appropriate Taiwan authorities. Although Plaintiffs-Appellees argued that they were unable to locate such a collateral agent, and that there was no precedent in Taiwan for the type of filing that would have had to be undertaken in Taiwan, those factual contentions were sharply disputed by Defendants-Appellants, and the Bankruptcy Court, quite properly, did not resolve those disputed issues in ruling on Plaintiffs-Appellees' motion for summary judgment. In any event, even if there were obstacles to compliance with Taiwan law, such obstacles did not rise to the type of legal prohibition that would have excused Plaintiffs-Appellees' non-performance under the doctrine of impossibility.

What is most noteworthy about the decision of the Bankruptcy Court below is that the issue of legal impossibility was never briefed by the parties. The Bankruptcy Court granted Plaintiffs-Appellees summary judgment based upon a theory that the Plaintiffs-Appellees never even raised at any point in the litigation, except in passing in their Reply

Memorandum of Law. *See* Reply Memorandum of Law in Support of FLAG's Motion for Summary Judgment as to FLAG's Amended Complaint and Elliott's Counter-Claims (Adv. ECF No. 109), pp. 5-6. Apparently recognizing that the legal arguments that the Plaintiffs-Appellees actually presented in support of their motion for summary judgment were without merit, the Bankruptcy Court simply created its own argument to excuse the debtors-in-possession's breach of their contractual obligations.

Even if the defense of impossibility were available to Plaintiffs-Appellees, which it was not, the Bankruptcy Court should not have considered that defense. Impossibility is an affirmative defense which must be raised by a party in a responsive pleading. Because Plaintiffs-Appellees never raised the issue of impossibility in any pleading, they waived the right to raise the issue as a defense in this action.

As set forth more fully below, there was no basis for granting summary judgment to the Plaintiffs-Appellees. The decision and judgment below should be reversed.

### Statement of Appellate Jurisdiction

Appellate jurisdiction is conferred upon this Court by 28 U.S.C. § 158(a), which provides in pertinent part that the District Court shall have jurisdiction to hear appeals "from final judgments, orders and decrees." The judgment of the Bankruptcy Court for the Southern District of New York, dated May 12, 2005 (Adv. ECF No. 153) (the "Judgment"), which granted the motion of Plaintiffs-Appellees for summary judgment, constitutes a final judgment disposing of all claims with respect to all parties in the adversary proceeding below. Defendants-Appellants Kensington International, Ltd. ("Kensington"), Springfield Associates, LLC ("Springfield"), Elliott Associates, L.P. ("Elliott Associates") and Elliott

-2-

International, L.P. ("Elliott International") (collectively, the "Elliott Defendants")

commenced a timely appeal by filing a Notice of Appeal from the Judgment on May 20,

2005. Adv. ECF No. 154. The Elliott Defendants filed a Designation of Record on Appeal

(Adv. ECF No. 160) and a Statement of Issues on Appeal (Adv. ECF No. 159) on May 27,

2005. The Appeal was docketed in this Court on June 21, 2005.

### Statement of Issues Presented

1.      Where a debtor contractually agrees to grant a creditor "a first priority

Security Interest" in certain collateral located outside the United States, is the debtor

obliged to take steps to ensure that the security interest is perfected in accordance with the

laws of the country in which the collateral is located?

2.      Where a debtor agrees to "take all actions to the maximum extent permitted

by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity

and perfection of [a] Security Interest" in collateral located outside the United States, is the

debtor obliged to take steps to ensure that the security interest is perfected in accordance

with the laws of the country in which the collateral is located?

3.      Did the Bankruptcy Court err when it held that it was legally impossible for

Plaintiffs-Appellees to comply with their contractual obligations?

4.      Under Section 9-307(c) of New York's Uniform Commercial Code, is Taiwan

a jurisdiction "whose law generally requires information concerning the existence of a

nonpossessory security interest to be made generally available in a filing, recording or

registration system as a condition or result of the security interest's obtaining priority over

the rights of a lien creditor with respect to the collateral" so that, under New York law, a security interest in collateral owned by a company located in Taiwan, in order to be deemed perfected, must be perfected pursuant to the law of Taiwan?

## Standard of Review

On an appeal from a final judgment of a bankruptcy court, a district court reviews the conclusions of law *de novo*. *In re Ionosphere Clubs Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990), *cert. denied*, 502 U.S. 808 (1991). On an appeal, such as this, from a bankruptcy court's summary judgment order, not only is the standard of review *de novo*, but a district court must draw all inferences in favor of the non-moving party. *In re T.R. Acquisition Corp.*, 309 B.R. 830, 835 (S.D.N.Y. 2003); *Morin v. Frontier Bus. Technologies*, 288 B.R. 663, 668-669 (W.D.N.Y. 2003).

## Statement of the Case

Plaintiffs-Appellees FLAG Telecom Group Limited, FLAG Asia Limited ("FLAG Asia"), FLAG Telecom Asia Limited, FLAG Telecom Taiwan Limited and FLAG Telecom Japan Limited (collectively, "FLAG") commenced this adversary proceeding by the filing of a Complaint on August 7, 2003. Adv. ECF No. 1. FLAG filed an Amended Complaint on August 13, 2003. Adv. ECF No. 4. This case arises out of a dispute concerning FLAG's performance of its contractual obligations in connection with post-petition debts owed pursuant to instruments, referred to herein as the Alcatel Note, the Indenture and the Indenture Notes and described more fully below.

## The Alcatel Note

Defendants-Appellants Kensington and Springfield are the former holders, by assignment, of a certain Senior Secured Note, due September 30, 2005 (the "Alcatel Note"), initially issued to Alcatel Submarine Networks, S.A. ("Alcatel") by Plaintiff-Appellee FLAG Asia.  Pursuant to the terms of a Security Agreement dated October 9, 2002, the Alcatel Note was secured by certain collateral, including the Taiwan Collateral.[1] Defendant-Appellee Wilmington Trust Company ("Wilmington") is the Collateral Agent under the Security Agreement.

Pursuant to Section 5 of the Alcatel Note, FLAG Asia was obliged to "take all actions to the maximum extent permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and perfection of" the security interest securing FLAG Asia's obligations under the Alcatel Note.  Section 5 of the Alcatel Note also provided that, if FLAG Asia did not perfect the security interest by December 31, 2002, such failure would constitute "an Event of Default for all purposes hereunder."  The December 31, 2002 deadline to perfect the security interest in the Taiwan Collateral was extended twice at FLAG's request, and ultimately expired on July 30, 2003. Counterstatement Regarding Material Facts with Respect to FLAG's Motion for Summary Judgment ("Elliott Defs'. 7056-1 Statement"), Exs. JJ-KK (Adv. ECF No. 105).

---

[1]     A copy of the Alcatel Note was filed as Exhibit D (Adv. ECF No. 68) to FLAG's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment as to FLAG's Amended Complaint and Elliott's Counter-Claims, filed pursuant to Local Bankruptcy Rule 7056-1 (Adv. ECF No. 64) ("FLAG 7056-1 Statement").  A copy of the Security Agreement was filed as Exhibit E (Adv. ECF No. 69) to the FLAG 7056-1 Statement.

It is undisputed that FLAG did not take the steps necessary to perfect the security interest in the Taiwan Collateral under Taiwan law by the July 30, 2003 deadline. [2] Accordingly, on August 4, 2003, three days before FLAG commenced this adversary proceeding, Kensington and Springfield notified FLAG Asia that an Event of Default had occurred under the Alcatel Note and exercised their option, pursuant to Section 8(c) of the Alcatel Note, to declare the entire remaining principal amount under the Alcatel Note immediately due and payable. [3] *See* FLAG 7056-1 Statement, Ex. X (Adv. ECF No. 88).

On or about January 26, 2004, FLAG paid Kensington and Springfield an amount equal to all of the unpaid principal on the Alcatel Note plus a portion of the unpaid

---

[2]    It should be noted, however, that FLAG did make an attempt to perfect the security interest in collateral located in Hong Kong, South Korea and Japan in accordance with the laws of those jurisdictions, *see* FLAG 7056-1 Statement, Exs. H-J (Adv. ECF No. 72-74), even though, under the arguments put forth by FLAG in this adversary proceeding, FLAG had no obligation to take these steps.

[3]    Section 8(c) of the Alcatel Note provides as follows:

> (c)    If an Event of Default . . . has occurred and is continuing, then the Holder in its sole discretion may declare all or any portion of the outstanding Principal Amount, (together with all accrued interest thereon and all other amounts due and payable with respect hereto) to be immediately due and payable and may demand immediate payment of all or any portion of the outstanding Principal Amount, (together with all accrued interest thereon and all amounts then due and payable).    If the Holder demands immediate payment of all or any portion of this Note, the Debtor/Payor shall immediately pay to the Holder all amounts due and payable with respect to this Note.

Alcatel Note, § 8(c).

interest due on the Alcatel Note.  However, because FLAG took the erroneous position that it had not breached the Alcatel Note, FLAG has never paid Kensington and Springfield any portion of the default interest on the Alcatel Note, which became due under Section 8(a) of the Alcatel Note when FLAG breached the Alcatel Note.[4]  Instead, FLAG incorrectly calculated the interest owed to Kensington and Springfield as if FLAG had never breached the Alcatel Note and as if the interest rate on the Alcatel Note had never increased.  In this appeal, Kensington and Springfield are seeking reinstatement of their claim for damages against FLAG for breach of the Alcatel Note, in an amount equal to the unpaid default interest owed under that instrument.

### The Indenture and the Indenture Notes

Pursuant to an Indenture dated as of October 9, 2002 (the "Indenture"), FLAG issued certain secured notes, denominated Series A Notes, due October 1, 2005 (the "Series A Notes"), Series B Notes, due October 1, 2004 (the "Series B Notes"), and Series C

---

[4]     Section 8(a) of the Alcatel Note provides as follows:

> (a)     If any Event of Default has occurred and is continuing, then the interest on this Note shall become the Overdue Rate to the extent permitted by law.  Any increase of the interest rate resulting from the operation of this subparagraph shall terminate as of the close of business on the date on which no Events of Default exist (subject to subsequent increases pursuant to this subparagraph).

Alcatel Note, § 8(a).  The Overdue Rate is defined in the Alcatel Note as "the interest rate set forth on this Note plus two hundred (200) basis points." Id., § 10, p. 15.

Notes, due October 1, 2004 (the "Series C Notes") (collectively, the "Indenture Notes"). Defendant-Appellee The Bank of New York ("BNY") is the Trustee under the Indenture.

At the time this adversary proceeding was commenced, Defendants-Appellants Elliott Associates and Elliott International owned an aggregate of $9,314,849 face amount of Series A Notes. Portions of the Indenture are annexed as Exhibit C to FLAG's 7056-1 Statement (Adv. ECF No. 67).

Pursuant to Section 3.05 of the Indenture, FLAG had the option, during the first eighteen months after issuance of the Series A Notes and if certain other conditions were met, to redeem the Series A Notes at two-thirds of the face amount thereof. However, FLAG was not permitted to exercise its right to redeem the Series A Notes at the reduced value in the event that an Event of Default under the Indenture had occurred and was continuing. Pursuant to Section 9.01(f) of the Indenture, any Event of Default under any other Indebtedness of FLAG, including the Alcatel Note, which resulted in an acceleration of such Indebtedness constituted an Event of Default under the Indenture.

On July 25, 2003, five days before it defaulted under the Alcatel Note, FLAG announced that it had elected to redeem all of the Indenture Notes, including the Series A Notes at two-thirds of the face amount thereof, on August 25, 2003. *See* FLAG 7056-1 Statement, Ex. W (Adv. ECF No. 87). However, the declaration by Kensington and Springfield of an Event of Default under the Alcatel Note, along with their exercise of their right to demand immediate payment of the principal amount outstanding under the Alcatel Note, constituted a cross-default under the Indenture, thereby precluding FLAG from exercising its right to redeem the Indenture Notes.

Had FLAG honored the demand of Kensington and Springfield for immediate payment of the Alcatel Note, as it was obliged to do, FLAG would have cured its cross-default under the Indenture, and could have proceeded with its announced redemption of the Indenture Notes at a discount.  Instead, FLAG commenced this adversary proceeding, seeking a declaration that it had not breached its obligations under the Alcatel Note, an injunction preventing acceleration of the Alcatel Note and the Indenture Notes and preventing the declaration of any default under those instruments, and unspecified compensatory damages.

On August 25, 2003, FLAG proceeded with its redemption of the Indenture Notes, including its redemption of the Series A Notes owned by Elliott Associates and Elliott International at two-thirds of their face value.  FLAG 7056-1 Statement, ¶ 48.  In this appeal, Elliott Associates and Elliott International are seeking reinstatement of their claim for damages in an amount equal to the difference between the full amount of their Series A Notes and the reduced redemption price paid by FLAG upon redemption of those Notes.

## The Course of the Proceedings

On August 13, 2003, FLAG moved for a preliminary injunction, seeking to enjoin defendants from taking any further action to assert any Event of Default under the Alcatel Note or the Indenture, and seeking to compel BNY to proceed with the redemption of the Indenture Notes, notwithstanding the cross-default under the Indenture caused by Kensington's and Springfield's acceleration of the Alcatel Note.  Adv. ECF No. 5-20.  On August 20, 2003, the Elliott Defendants cross-moved for a preliminary injunction to

compel redemption of the Alcatel Note and to prevent FLAG from proceeding with the redemption of the Indenture Notes. Adv. ECF No. 27-30.

By Order dated August 22, 2003, the Bankruptcy Court (Drain, U.S.B.J.) granted FLAG's motion for a preliminary injunction and denied the Elliott Defendants' cross-motion. Adv. ECF No. 37. FLAG proceeded with its redemption of the Indenture Notes, including the redemption of the Series A Notes at two-thirds of their face value. The Bankruptcy Court's Order was without prejudice to the rights of the Elliott Defendants to seek damages under the Alcatel Note and the Indenture Notes. *See* Adv. ECF No. 37, ¶¶ 7, 9. Although the Bankruptcy Court's Order largely relieved FLAG of any continuing obligations under the Indenture, the Order specifically provided that collateral securing the Indenture Notes would remain in place pending adjudication of any claims for damages against FLAG. Id., ¶ 5.

The Elliott Defendants filed their Answer to the First Amended Complaint on September 12, 2003. Adv. ECF No. 42. In their Answer, the Elliott Defendants asserted Counterclaims against FLAG, seeking damages and declaratory relief for FLAG's breach of the Alcatel Note and FLAG's wrongful redemption of the Series A Notes at two-thirds of their face value. Id., ¶¶ 79-99. Specifically, Kensington and Springfield sought immediate payment of the Alcatel Note, and Elliott Associates and Elliott International sought damages in the amount of $3,104,953.17, representing the difference between the face amount of their Series A Notes and the two-thirds redemption price improperly paid by FLAG when FLAG improperly redeemed the Indenture Notes.

Wilmington filed its Answer to the First Amended Complaint on September 9, 2003. In its Answer, Wilmington asserted a Counterclaim against FLAG and a Cross-Claim against Kensington and Springfield for payment, pursuant to Section 26(a) of the Security Agreement, of its attorneys' fees incurred in connection with the dispute between FLAG and the Elliott Defendants.[5]  Adv. ECF No. 39.

------

[5]      Section 26(a) of the Security Agreement provides as follows:

> 26.    <u>COLLATERAL AGENT.</u>
>
> (a)      Each Grantor [*i.e.,* FLAG] hereby agrees to pay all fees and expenses of the Collateral Agent [*i.e.,* Wilmington] and its directors, employees and agents for, and to hold them harmless against, any loss liability or expense incurred without gross negligence or willful misconduct on their part arising out of or in connection with the acceptance or administration of the Collateral, including the reasonable costs and expenses or defending themselves against any claim (whether asserted by the Company, any Holder or any other Person) or liability in connection with the exercise or performance of any of their powers or duties hereunder, or in connection with enforcing the provisions of this <u>Section 26</u>, except to the extent that any such loss, liability or expense was due to the Collateral Agent's gross negligence or willful misconduct.  If and only to the extent that the Grantors shall fail to indemnify the Collateral Agent as provided herein within thirty (30) days of the Collateral Agent's request for such indemnification, then Alcatel shall indemnify the Collateral Agent in accordance with this <u>Section 26(a)</u> as if Alcatel were the primary obligor under this <u>Section 26(a)</u>.

Security Agreement, § 26(a).

BNY filed its Answer to the First Amended Complaint on September 12, 2003.  In

its Answer, BNY asserted a Counterclaim against FLAG for payment, pursuant to Section

12.06(b) of the Indenture, of its attorneys' fees incurred in connection with the dispute

between FLAG and the Elliott Defendants.[6]  Adv. ECF No. 41.

---

[6]     Section 12.06 of the Indenture provides, in pertinent part, as follows:

> SECTION 12.06.     Compensation and Reimbursement.    The
> Company [i.e., FLAG] agrees:
>
> *                    *                    *
>
> (b)     to reimburse [BNY] upon its request for all reasonable
> expenses, disbursements and advances incurred or made by
> the Trustee in accordance with any provision of this Indenture
> (including the reasonable compensation and the expenses and
> disbursements of its agents and counsel), except any such
> expense, disbursement or advances as may be attributable to
> the Trustee's negligence or willful misconduct; and
>
> (c)     to indemnify [BNY] and its directors, employees and
> agents for, and to hold them harmless against, any loss,
> liability or expense incurred without negligence or willful
> misconduct on their part arising out of or in connection with
> the acceptance or administration of the trust or trusts
> hereunder, including the reasonable costs and expenses of
> defending themselves against any claim (whether asserted by
> the Company, or any Holder or any other Person) or liability in
> connection with the exercise or performance of any of their
> powers or duties hereunder, or in connection with enforcing
> the provisions of this Section 12.06, except to the extent that
> any such loss, liability or expense was due to the Trustee's
> negligence or willful misconduct.

Indenture, § 12.06.  The text of this provision of the Indenture is annexed as part of Exhibit
D to the Declaration of Edward P. Grosz, dated March 14, 2005, in opposition to FLAG's
Second Motion for Summary Judgment (Adv. ECF No. 131).

On March 25, 2004, FLAG filed a Motion to Amend the Bankruptcy Court's Preliminary Injunction to release the collateral securing the Indenture Notes and to substitute separate collateral to secure any remaining claims under the Indenture. Adv. ECF No. 53. After this motion was fully briefed and argued, FLAG voluntarily withdrew its motion.

On August 1, 2004, FLAG filed its motion for summary judgment. Adv. ECF No. 61-93. In that motion, FLAG argued, <u>inter alia</u>, that it was not obliged to perfect the security interest in the Taiwan Collateral in accordance with the laws of the Taiwan. FLAG's motion sought summary judgment as to its Claims and the Counterclaims of the Elliott Defendants, but did not address the claims for attorneys' fees asserted by Wilmington and BNY.

On August 3, 2004, BNY filed a motion to Amend its Answer to assert a Second Counterclaim against FLAG. Adv. ECF No. 95-97. In its proposed Second Counterclaim, BNY sought a declaration that, in the event the Elliott Defendants prevail on their claim that FLAG had breached the Alcatel Note and the Indenture, then the other holders of the Indenture Notes should also be awarded damages for such breach. Adv. ECF No. 96, Ex. 1.

By "So Ordered" Stipulation entered on September 23, 2004, the parties agreed that BNY would be permitted to file its Second Counterclaim and that FLAG's pending motion for summary judgment would apply to the issues raised by BNY's Second Counterclaim. Adv. ECF No. 101.

## The Memorandum of Decision and Judgment

By Memorandum of Decision dated February 10, 2005 (the "Memorandum of Decision"), the Bankruptcy Court granted FLAG's motion for summary judgment. Adv. ECF No. 114. In its Memorandum of Decision, the Bankruptcy Court did not rule in favor of FLAG on any of the arguments that FLAG put forward. Instead, the Bankruptcy Court granted FLAG summary judgment based upon an argument – which was never alleged by FLAG in any pleading or briefed by the parties – that perfection of the security interest in the Taiwan Collateral pursuant to the laws of Taiwan was legally impossible,. Memorandum of Decision, pp. 10-14.

The Memorandum of Decision disposed of all claims asserted in the adversary proceeding, except for the claims for attorneys' fees asserted by Wilmington and BNY.

On February 24, 2005, FLAG filed a second motion for summary judgment on the Counterclaims and Cross-Claims of Wilmington and BNY. Adv. ECF No. 115-119. In that motion, FLAG also sought an award of attorneys' fees against the Elliott Defendants, dismissal of BNY's First Counterclaim for attorneys' fees and an order directing the Elliott Defendants to satisfy the claims for attorneys' fees asserted by Wilmington. Thus having, at least temporarily, successfully avoided its obligations to the Elliott Defendants under the Alcatel Note and the Indenture, FLAG thereupon sought to avoid its contractual obligations to Wilmington and BNY and to impose the full costs and expenses of the litigation on the Elliott Defendants. FLAG's attempt to have the Elliott Defendants pay for the attorneys' fees incurred by all parties in this action had no basis in law or under the contractual agreements among the parties, as the Bankruptcy Court ultimately correctly held. *See*

-14-

Supplemental Opinion dated May 12, 2005 (the "Supplemental Opinion") (Adv. ECF No. 152), pp. 1-2.

On March 14, 2005, BNY filed a cross-motion for summary judgment as to its First Counterclaim seeking attorneys' fees from FLAG. Adv. ECF No. 124-127.

On April 4, 2005, following oral argument on FLAG's second motion for summary judgment, FLAG filed two Stipulations and a Proposed Judgment with the Bankruptcy Court. Adv. ECF No. 135. Pursuant to the two Stipulations, FLAG agreed to pay attorneys' fees to Wilmington and BNY in exchange for dismissal of those parties' remaining Counterclaims. By its stipulation with BNY, FLAG effectively withdrew its second motion for summary judgment, and its opposition to BNY's cross-motion for summary judgment, to the extent that FLAG sought to avoid its contractual obligations to pay BNY attorneys' fees. The two Stipulations were "So Ordered" by the Bankruptcy Court on May 12, 2005.

In the Proposed Judgment, FLAG proposed that the collateral securing the Alcatel Note and the Indenture Notes be released. The Elliott Defendants and BNY filed papers opposing FLAG's request that the collateral be released and requesting that the collateral remain in place pending adjudication of any appeals in this matter. Adv. ECF No. 137-138. On April 29, 2005, BNY filed a motion to preserve the collateral securing the Indenture Notes pending appeal. Adv. ECF No. 145-146.

By Supplemental Opinion dated May 12, 2005, the Bankruptcy Court denied FLAG's second motion for summary judgment and declined to award FLAG attorneys' fees from the Elliott Defendants. Adv. ECF No. 152. In the Supplemental Opinion, the

Bankruptcy Court declined FLAG's request to release the collateral securing the Alcatel Note and the Indenture Notes at that time, and stated that it would treat BNY's motion as a motion for a stay of release of the collateral securing the Indenture Notes pending appeal. Supplemental Opinion, p. 3. On May 20, 2005, simultaneously with their filing of their Notice of Appeal from the Judgment, the Elliott Defendants filed a cross-motion for a stay of any release of the collateral securing the Alcatel Note and the Indenture Notes pending resolution of all appeals in this matter. Adv. ECF No. 156. The motion and cross-motion of BNY and the Elliott Defendants seeking to preserve collateral pending appeal are currently pending before the Bankruptcy Court.

On May 23, 2005, BNY filed a Notice of Appeal from the Judgment. Adv. ECF No. 157. BNY's appeal has been docketed in this Court under Docket Number 05-05376 (NRB).

### Statement of Facts

The fundamental issue in this case – at least as framed by the parties in their pleadings and in connection with FLAG's motion for summary judgment – was whether FLAG was contractually obligated to perfect the security interest securing the Alcatel Note in accordance with the laws of the jurisdictions where the collateral was located. In particular, the parties disagreed as to whether the Alcatel Note and the Security Agreement required FLAG to perfect the security interest in the Taiwan Collateral in accordance with the laws of Taiwan. Indeed, FLAG claimed, in its motion for summary judgment, that "the *only* real issue" in the case was whether FLAG had any contractual obligation to comply with Taiwan law. Memorandum of Law in Support of FLAG's Motion for Summary

Judgment as to FLAG's Amended Complaint and Elliott's Counterclaims ("FLAG Summ. J. Memo of Law"), p. 9 (emphasis in original).[7]

The plain language of the Alcatel Note and the Security Agreement required FLAG to comply with Taiwan law.  Thus, pursuant to Section 5 of the Alcatel Note, FLAG was obliged to "take all actions to the maximum extent permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and perfection of" the security interest securing FLAG's obligations under the Alcatel Note.  A security interest that was not enforceable as a first priority security interest in the Asian jurisdictions where the collateral was located would obviously not be "enorceab[le], valid[] and perfect[ed]" in any meaningful sense of those words.  Not surprisingly, in interpreting this provision and the other evidence presented by the parties, the Bankruptcy Court had no trouble holding that FLAG had a "very high burden" to take the steps necessary to perfect the security interest securing the Alcatel Note, and to assume, contrary to FLAG's contentions, that this required FLAG to comply with Taiwan law.  Memorandum of Decision, p. 11.

The Bankruptcy Court's decision to grant FLAG's motion for summary judgment cannot stand in light of the Bankruptcy Court's own assumption that FLAG had to comply with Taiwan law.  Once the Bankruptcy Court reached this conclusion, it had not choice but to deny FLAG's motion for summary judgment.  Indeed, the Bankruptcy Court could have granted summary judgment in favor of the Elliott Defendants, since it was undisputed that FLAG did not comply with Taiwan law.

_____

[7]    FLAG's Memorandum of Law is docketed at Adv. ECF No. 62.

In the following sections, we turn first to the relevant contractual provisions and evidence that demonstrate that FLAG had to comply with Taiwan law. We then analyze the holdings of the Memorandum of Decision and the errors that led the Bankruptcy Court to grant summary judgment in favor of FLAG.

## A.    FLAG's Obligations to Perfect
## The Security Interest in the Taiwan Collateral

The Alcatel Note and the Indenture Notes were issued by FLAG in 2002 pursuant to FLAG's Third Amended Plan of Reorganization. The principal amount of the Alcatel Note was $27,352,461, and the aggregate principal amount of the Indenture Notes was $50.25 million.

To secure FLAG Asia's obligations under the Alcatel Note, FLAG and Wilmington, as collateral agent, entered into the Security Agreement. Under the Security Agreement, FLAG assigned a "first priority continuing Security Interest" upon certain collateral to Wilmington. Security Agreement, § 2(a). The collateral securing the Alcatel Note was located in, among other places, Hong Kong, Japan, South Korea and Taiwan. The specific purpose of the assignment of a security interest was "to secure the prompt and complete payment, performance and observance of all of the Secured Obligations [including the Alcatel Note]." Id. Manifestly, in order to fulfill the stated purpose of the Security Agreement, in the event of a breach of the Alcatel Note, the collateral subject to the Security Agreement had to be available for foreclosure. Because any foreclosure proceeding would have to take place in the Asian jurisdictions where the collateral was located, the security interest, to have any significance, would have to be fully enforceable

-18-

in those jurisdictions.   There is no other conceivable meaning to the provision of the

Security Agreement granting a "first priority Security Interest."   Id. (emphasis added).

Further, the Alcatel Note itself provided that FLAG would take "all actions to the

maximum extent permitted by applicable law" to perfect the security interest securing the

Alcatel Note:

> Commencing no later than October 15, 2002, the
> Debtor/Payor and its Related Operating Companies shall take
> all actions to the maximum extent permitted by applicable law
> (the 'Perfection Actions') reasonably necessary to ensure the
> legality, enforceability, validity and perfection of such Security
> Interest on the Collateral and [would] continue to take such
> action as necessary so as to maintain the legality,
> enforceability, and validity of such Security Interest for so long
> as any portion of this Note remains outstanding.

Alcatel Note, § 5 (emphasis in original).

In moving for summary judgment, FLAG argued incorrectly that this provision of

the Alcatel Note required FLAG to perfect the security interest in accordance with only the

laws of the State of New York, which governed both the Alcatel Note and the Security

Agreement.   See Alcatel Note, § 15; Security Agreement, §17.   FLAG's position is not

consistent with the express contractual language quoted above.   There would have been

no reason to include in Section 5 of the Alcatel Note the requirement that FLAG comply

with "applicable law," if the drafters intended FLAG to comply only with New York law.

Not surprisingly, FLAG's position was not accepted by the Bankruptcy Court, which

assumed that FLAG was obliged to comply with the perfection requirements of foreign

law.   Memorandum of Decision, p. 8.   In any event, even if the contracts required FLAG to

comply with only New York law, the law of that State required FLAG to comply with the

-19-

laws governing the perfection of security interests in the foreign jurisdictions where the debtors were actually located, including Taiwan. *See* pp. 40-44, *infra*.

Further, it is significant that Section 5 of the Alcatel Note provided that FLAG had until December 31, 2002, or until approximately 12 weeks after the execution of the Alcatel Note, to perfect the security interest in the collateral. Such a long period of time would not have been needed if, as FLAG contended in this adversary proceeding, the only thing FLAG had to do was file financing statements in the United States. Indeed, during the negotiations over the terms of the Alcatel Note, FLAG specifically asked Alcatel to agree to such a lengthy timeframe in order to permit FLAG to comply with the perfection requirements of the various Asian jurisdictions in which the collateral was located. Elliott Defs'. 7056-1 Statement, Ex. DD.[8]

Of course, FLAG did not need 12 weeks to file financing statements in the United States. In fact, FLAG filed four UCC-1 financing statements in Washington, D.C. on October 10, 2002, only one day after the Alcatel Note was executed.[9]  *See* FLAG 7056-1 Statement, ¶ 18 and Ex. G (Adv. ECF No. 71). Although FLAG now claims that making those filings was the only action FLAG had to take in order to perfect the security interest

---

[8]    By e-mail dated September 20, 2002, John Lowe, General Counsel of Alcatel, advised Andy Evans of FLAG that Alcatel would insist on requiring FLAG to "perfect in other countries" because of "the great importance we attach to perfection," but that Alcatel would agree to give FLAG until December 31, 2002 to comply with its perfection obligations. Elliott Defs'. 7056-1 Statement, Ex. DD.

[9]    FLAG filed those UCC-1 financing statements in Washington, D.C. based upon its flawed conclusion that filing in that location was required by N.Y. UCC § 9-307(c). *See* pp. 40-44, *infra*.

in the collateral securing the Alcatel Note, *FLAG twice requested and obtained from Alcatel extensions of time to comply with its perfection obligations.* By waivers dated January 31, 2003 and February 28, 2003 – long after FLAG filed its UCC-1 financing statements in Washington, D.C. – Alcatel agreed to extend FLAG's time to bring itself into compliance with Taiwan law to, respectively, February 28, 2003 and July 30, 2003. Elliott Defs'. 7056-1 Statement, Exs. JJ-KK. The only reason that FLAG needed these extensions is because FLAG knew that, as of the date of the waivers, it had not fulfilled its contractual obligation to "take all actions to the maximum extent permitted by applicable law" to perfect the security interest in the Taiwan Collateral. Alcatel Note, § 5.

The parties' understanding that FLAG would have to comply with the perfection requirements imposed by foreign law is further supported by an explicit reference to South Korean law contained in Section 5 of the Alcatel Note:

> Notwithstanding anything in this <u>Section 5</u> to the contrary, with respect to any Perfection Actions to be taken by the Debtor/Payor and its Related Operating Companies in South Korea, Debtor/Payor shall only be required to use their respective best commercially reasonable efforts to effect the Perfection Actions no later than March 31, 2003 and shall keep the Collateral Agent and the Holder reasonably informed as to its progress with respect thereto.

Alcatel Note, § 5 (emphasis in original).

There would have been no need for this carve-out with respect to perfection actions in South Korea if, as FLAG argued below, compliance with foreign law were not required. Significantly, the Alcatel Note did not contain any carve-out for compliance with Taiwan law. As the Bankruptcy Court held, the absence of such a carve-out for Taiwan law demonstrates that FLAG had to exercise something more than "best commercially

-21-

reasonable efforts" with respect to perfection actions in Taiwan. This conclusion is substantiated by the negotiations which led to the carve-out respecting the South Korean collateral. On September 20, 2002, John Lowe, General Counsel of Alcatel, wrote to Andy Evans of FLAG that, while Alcatel would agree to FLAG's request to reduce FLAG's obligations with respect to the South Korean collateral, Alcatel would not agree to FLAG's request to "eliminate the event of default consequences for failure to perfect in other countries" because of "the great importance we attach to perfection." Elliott Defs'. 7056-1 Statement, Ex. DD.

That the parties understood that FLAG would have to comply with the perfection requirements imposed by the Asian jurisdictions where the collateral was located is further evidenced by the course of dealings of the parties after the parties entered into the Alcatel Note and the Security Agreement. In 2003, after FLAG filed its UCC-1 financing statements in Washington, D.C., FLAG executed three separate agreements with Wilmington to perfect Wilmington's security interest in collateral located in Hong Kong, South Korea and Japan in accordance with the laws of those jurisdictions. FLAG 7056-1 Statement, Exs. H-J (Adv. ECF No. 72-74).

**B.    FLAG Breaches its Obligation to
        Perfect the Security Interest
        In the Taiwan Collateral**

It is undisputed that FLAG never perfected the security interest in the Taiwan Collateral pursuant to the laws of Taiwan. Although FLAG now takes the position that it had no obligation to comply with Taiwan law, early in 2003, FLAG repeatedly acknowledged that it, in fact, was contractually obligated to do so. Thus, by e-mail dated

-22-

February 11, 2003, Clinton Johnston, FLAG's outside counsel, stated unequivocally to Sandra R. Ortiz of Wilmington that, under the Security Agreement, FLAG was obliged "to take steps necessary to perfect the security interest in each of the jurisdictions where the Collateral is located":

> FLAG granted Alcatel a security interest in one of the 6 fiber pairs. This security interest relates to a single New York law promissory note. It was granted pursuant to a New York law security agreement (the attached document). The security interest was immediately perfected in the U.S. and in Bermuda by making several filings. In this security agreement FLAG covenants to take steps necessary to perfect the security interest in each of the jurisdictions where the Collateral is located. FLAG's local counsel Shay & Partners is now working on perfecting the interest under Taiwanese law.

FLAG 7056-1 Statement, Ex. N at WTC 001746 (Adv. ECF No. 78) (emphasis added). Similarly, by e-mail dated March 6, 2003, Mr. Johnston admitted that FLAG's efforts to date "in no way translate[d] into perfection" and were "thus of little effect with regard to rights against third parties.":

> Taiwanese courts will recognize and enforce New York law security agreements. However, the existence of such an agreement in no way translates into perfection and thus is of little effect with regard to rights against third parties. FLAG's Taiwanese counsel has reviewed the existing New York law security agreement and determined that his firm can issue an enforceability opinion with certain carve outs.

FLAG 7056 Statement, Ex. T at D-00005 (Adv. ECF No. 84) (emphasis added). Finally, by letter dated March 31, 2003, FLAG's Taiwan counsel, Arthur Shay, stated that the security interest created in the Taiwan collateral "cannot be deemed a 'first priority' interest ranking before that of any other non-governmental creditor":

> c.     The security interest that has been created in the Taiwan Collateral cannot be deemed to be a "first priority" interest ranking before that of any other non-governmental creditor until it has been registered with the Ministry of Economic Affairs ("MOEA"), and then only if such registration is prior in time to that of any other party on the property. WTC will not be deemed a qualified pledgee on whose behalf a lien on the Taiwan Collateral may be registered with the MOEA unless it has a branch office in Taiwan.

Elliott Defs'. 7056-1 Statement, Ex. FF, p. 2.  Indeed, it was not until July 1, 2003, barely one month before it commenced this adversary proceeding and over eight and one-half months after the execution of the Alcatel Note and the Security Agreement, that FLAG first notified Wilmington that, in FLAG's view, it had complied with its obligation to perfect the security interest when FLAG filed UCC-1 financing statements in Washington, D.C. on October 10, 2002.  FLAG 7056-1 Statement, Ex. U (Adv. ECF No. 85).  The reason for this abrupt change in position is obvious.  FLAG had, by that point, decided to redeem the Indenture Notes and, because of the cross-default provisions of the Indenture, had to come up with an excuse for why it had not complied with its contractual obligations under the Alcatel Note.

The only obstacle to perfecting the security interest in the Taiwan Collateral was that, under Taiwan law, only a Taiwanese entity, or a Taiwanese branch of a foreign entity, is permitted to register a security interest. *See* pp. 28-29, *infra*.  Because Wilmington did not qualify as a party permitted to register a security interest in Taiwan, in order to comply with the Alcatel Note and the Security Agreement, FLAG had to identify another party willing to act as a co-collateral agent with Wilmington.   The Security Agreement specifically contemplated that it might be necessary to locate a co-collateral agent for

collateral located outside the United States and provided a mechanism for appointing such

an agent:

>27.    UNDERLINE[CO-COLLATERAL AGENT].
>
>(a)    At any time or times, for the purpose of meeting any legal requirement of any jurisdiction in which any of the Collateral may at the time be located, the Collateral Agent shall have the power to appoint any Person or Persons either to act as co-collateral agent, or co-collateral agents, jointly with the Collateral Agent of all or any part of the Collateral or to act as separate collateral agents of all or any part of the Collateral and to vest in such Person or Persons, in such capacity, such title to the Collateral or any part thereof, and such rights, powers, duties or obligations as the Collateral Agent may consider necessary or desirable, subject to the other provisions of this UNDERLINE[Section 27].

Security Agreement, § 27(a) (emphasis in original).

In its motion for summary judgment, FLAG argued that it was excused from any

obligation to comply with Taiwan law since only Wilmington could appoint a co-collateral

agent and claimed that Wilmington, somehow, had prevented FLAG from perfecting the

security interest in the Taiwan Collateral.   In granting FLAG's motion for summary

judgment, the Bankruptcy Court, for very good reason, did not even bother to address this

argument, which had no support in the record.  The Alcatel Note provided that FLAG, not

Wilmington, had the obligation to "take all actions to the maximum extent permitted by

applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and

perfection" of the security interest in the collateral.  Alcatel Note, § 5.[10]  Thus, it was

FLAG's contractual obligation to make sure that a Taiwanese co-collateral agent was

located and FLAG's default if one could not be identified.  FLAG's argument also ignored

the fact that FLAG had the obligation to bear the costs associated with obtaining a co-

collateral agent. *See id.,* § 26(a).  On April 25, 2003, Wilmington informed FLAG that

BNY might be interested in acting as co-collateral agent, but that it wanted to have its legal

fees paid.  FLAG did not provide any response to Wilmington and BNY's inquiries in this

regard.  Declaration of Edward P. Grosz, dated March 14, 2005, in opposition to FLAG's

Second Motion for Summary Judgment (Adv. ECF No. 131), Ex. U, p. 48  Thus, although

FLAG protested, in moving for summary judgment, that it was always prepared to

"cooperate" with Wilmington, it took no action when requested to do so by Wilmington.

C.    Taiwan Law, Regulations and Practice
      Governing the Perfection of Security Interests

The parties submitted extensive evidence concerning the relevant legal rules,

regulations and practices governing perfection of security interests in Taiwan.  *See*

Declaration of Arthur Shay in Support of FLAG's Motion for Summary Judgment as to

FLAG's Amended Complaint and Elliott's Counter-Claims, dated July 30, 2004 ("Shay

Moving Decl.") (Adv. ECF No. 63); Declaration of Anthony Minton Lo in Opposition to

FLAG's Motion, dated September 23, 2004 ("Lo Decl.") (Adv. ECF No. 104); Declaration

---

[10]    Wilmington made this exact point in response to FLAG's summary judgment
motion, and also asserted that its efforts to locate a co-collateral agent were carried out as
an "accommodation" to FLAG, not out of any contractual duty.  *See* Memorandum of
Wilmington Trust Company in Response to Plaintiffs' Motion for Summary Judgment, p. 1.
Adv. ECF No. 98.

of Arthur Shay in Support of FLAG's Reply to Elliott's Opposition to FLAG's Motion for Summary Judgment as to FLAG's Amended Complaint and Elliott's Counter-Claims ("Shay Reply Decl.") (Adv. ECF No. 110); Declaration of David Wen-Tang Su in Support of FLAG's Reply Supporting its Motion for Summary Judgment as to FLAG's Amended Complaint and Elliott' Counter-Claims ("Su Reply Decl.") (Adv. ECF No. 111). Each of the experts that submitted evidence in connection with FLAG's motion for summary judgment agreed that all that was required under Taiwan law was for FLAG to locate a Taiwan individual or entity willing to act as collateral agent and willing to register the security interest with the appropriate Taiwan authorities. *See* Shay Moving Decl., ¶ 13; Lo Decl., ¶ 11; Su Reply Decl., ¶ 16. The parties disagreed as to whether such an agent could be located. *Compare* Shay Moving Decl., ¶¶ 28-36 *with* Lo Decl., ¶¶ 19-21. FLAG also made the irrelevant and disputed claim that there was no precedent for the perfection of a security interest in Taiwan for collateral like the Taiwan Collateral. *Compare* Shay Moving Decl., ¶¶ 25-27 *with* Lo Decl., ¶¶ 19-22 and Ex. C. Even if there were no precedent for the type of filing that FLAG would have had to undertake, and there was at least one precedent, and even if FLAG could not have found a Taiwan entity willing to act as collateral agent, those facts would not have justified the conclusion that it was legally impossible for FLAG to have complied with its contractual obligations. *See*, pp. 34-40, *infra*. At most, all FLAG could demonstrate was that it was difficult, but not impossible, for it to comply with Taiwan law.

**D.    The Errors of the Memorandum of Decision Below**

The Bankruptcy Court's legal analysis of the issues raised by FLAG's motion for summary judgment is significant for two things. First, the Bankruptcy Court, quite

properly, was unpersuaded by the primary arguments that FLAG put forth in support of its motion.    Second, the Bankruptcy Court was able to grant FLAG's motion only by substantially re-writing the relevant contracts among the parties and by misapplying a legal theory, the doctrine of impossibility, that had never been raised as an affirmative defense by FLAG (and had therefore been waived), had not been briefed by the parties and, in any event, had no application to this case.

In its Memorandum of Decision granting FLAG's motion, the Bankruptcy Court first addressed FLAG's argument that the mere filing of four UCC-1 financing statements in Washington, D.C. satisfied FLAG's obligation to perfect the security interest in the collateral securing the Alcatel Note.    The Bankruptcy Court noted that FLAG's argument disregarded the actual language of the Alcatel Note, which required FLAG to "take all actions to the maximum extent permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and perfection of" the security interest securing FLAG Asia's obligations under the Alcatel Note.    Alcatel Note, § 5 (emphasis added).    The Bankruptcy Court held that it was at least arguable that the Alcatel Note's reference to "applicable law" was broad enough to encompass the laws of the jurisdictions where the collateral was actually located.    Indeed, it is hard to see how the Alcatel Note could be interpreted any other way.    The security interests were of value only to the extent they could be enforced in the jurisdictions where the collateral was located.    In order for the security interest in the Asian collateral to be "legal[], enforceab[le], valid[] and perfect[ed]," as a "first priority security interest," the security interest would have to have priority over

-28-

any competing lienholders.  If, as FLAG acknowledged,[11] the rights of Wilmington as a

secured party could be defeated by a secured creditor registering security interests in the

foreign jurisdictions where the collateral was located after the date of the Alcatel Note,

then Wilmington's standing as a secured creditor would be entirely illusory.  Accordingly,

the Bankruptcy Court assumed, contrary to FLAG's primary argument, that the Alcatel Note

required FLAG to comply with Taiwan law.

Having assumed that FLAG had to comply with Taiwan law, the Bankruptcy Court

then analyzed the scope of FLAG's contractual obligation.  The Bankruptcy Court noted,

correctly, that the Alcatel Note required FLAG to take "all actions to the maximum extent

permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability,

and validity of such Security Interest on the Collateral."  Alcatel Note, § 5 (emphasis

added).  The Bankruptcy Court described this requirement of the Alcatel Note as imposing

a "very high burden" on FLAG, requiring more than just FLAG's "best efforts" to bring itself

in compliance with Taiwan law.  Memorandum of Decision, p. 11.

Having recognized that FLAG had a "very high burden" to comply with Taiwan

law, the Bankruptcy Court then undertook an analysis of what steps FLAG had to

undertake to fulfill that burden.  It is at this point that the Bankruptcy Court made four

crucial errors, creating a false conflict between, on the one hand, the requirements of the

Alcatel Note and Security Agreement and, on the other, the requirements of Taiwan law.

---

11    See FLAG 7056-1 Statement, Ex. N at WTC 001746 (Adv. ECF No. 78); Elliott Defs'.
7056-1 Statement, Ex. FF, p. 2.

First, the Bankruptcy Court held that FLAG's contractual burden was quite narrow in that FLAG was required only to "register" the security interest with the Taiwan authorities.  Memorandum of Decision, p. 11.  The Bankruptcy Court thus drew the strange and insupportable conclusion that FLAG had the "very high burden" to do something very narrow and technical.  In fact, neither the Alcatel Note nor the Security Agreement uses the word "register" to describe the scope of FLAG's obligations.  Rather, the Alcatel Note defines FLAG's obligations much more broadly to include the undertaking of "all actions . . . reasonably necessary to ensure the legality, enforceability, and validity of such Security Interest on the Collateral."  Alcatel Note, § 5.  Contrary to the holding of the Bankruptcy Court, the phrase "all actions" is sufficiently broad to require more than a mere registration.  The phrase is broad enough to have required FLAG to arrange for a local co-collateral agent to make the necessary filings required by Taiwan law and to enter into the necessary agreements with the co-collateral agent.  That the Alcatel Note required FLAG, if necessary, to enter into supplemental agreements to effectuate the perfection of the security interest in the collateral is demonstrated not only by the plain language of the Alcatel Note, that required FLAG to undertake "all actions . . . reasonably necessary" to perfect the security interest, but also by the fact that FLAG did, in fact, enter into separate agreements with Wilmington to attempt to perfect the security interest in collateral located in Hong Kong, South Korea and Japan.  FLAG 7056-1 Statement, Exs. H-J (Adv. ECF No. 72-74).

Second, having incorrectly held that all FLAG was required to do was "register" the security interest, and nothing more, the Bankruptcy Court abruptly and without explanation re-defined what it was that FLAG had to register.  At the top of page 11 of the

Memorandum of Decision, the Bankruptcy Court held that FLAG was obliged to register the "Security Interest" created by the Security Agreement. In the very next paragraph, however, the Bankruptcy Court held that it was not the security interest that had to be registered, but rather the Security Agreement itself that had to be registered. There was, of course, no contractual basis for the Bankruptcy Court's re-definition of the scope of FLAG's obligations. In fact neither the Alcatel Note nor the Security Agreement imposed on FLAG any obligation to do anything with the Security Agreement. Rather, the Alcatel Note required FLAG to undertake "all actions to the maximum extent permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and perfection of such Security Interest." Alcatel Note, § 5 (emphasis added). The term "Security Interest" is defined in the Security Agreement to mean "the Liens in and charges (fixed or floating, as the case may be) over the Collateral granted hereunder securing the Secured Obligations." Security Agreement, p. 5. Thus, it was the liens on the collateral, not the Security Agreement, that had to be perfected in accordance with Taiwan law.

Third, having incorrectly held that FLAG was obliged to "register" the Security Agreement, the Bankruptcy Court compounded its error by implicitly holding that the only thing that FLAG could do to comply with the provisions of the Alcatel Note and the Security Agreement was to register the Security Agreement in Taiwan. Thus, the Bankruptcy Court found it significant that "Taiwanese law did not permit the registration of the FNAL Security Agreement as a valid, enforceable agreement." Memorandum of Decision, p. 11. There was, in fact, no significance to this finding. There was no basis in the language of either the Alcatel Note or the Security Agreement for the Bankruptcy Court to conclude that either document required FLAG to register the Security Agreement, as

-31-

opposed to the liens created by the Security Agreement, with the Taiwan authorities. Indeed, the Bankruptcy Court's analysis proves too much. Even FLAG conceded that it was obliged to register the security interest created by the Security Agreement when it filed UCC-1 financing statements in Washington, D.C. When it did so, FLAG, of course, did not register the Security Agreement in Washington. Rather, FLAG filed UCC-1 financing statements in Washington, using forms that complied with the requirements of the laws of that jurisdiction. Just as the laws of Washington, D.C. required FLAG to prepare and file financing statements in order to perfect the security interest in accordance with the laws of that jurisdiction, the laws of Taiwan required FLAG to prepare and file certain other documentation in order to perfect the security interest in the Taiwan Collateral in accordance with the laws of that jurisdiction. *See* Lo Decl., ¶¶ 16-17. The Bankruptcy Court never explained why one type of filing in Washington was proper, while a separate type of filing in Taiwan would have been contrary to the requirements of the Alcatel Note and the Security Agreement.

Fourth, having erroneously concluded that the Alcatel Note and the Security Agreement required FLAG to register the Security Agreement in Taiwan, the Bankruptcy Court created a false conflict between the laws of Taiwan and the requirements of the Alcatel Note and the Security Agreement and erroneously concluded that it was impossible for FLAG to comply with its contractual obligations. Contrary to the holding of the Bankruptcy Court, there was no legal impediment to FLAG's perfecting the security interest created in the Taiwan Collateral. All FLAG had to do was find a co-collateral agent in Taiwan willing to undertake the appropriate filings in that jurisdiction. Lo Decl., ¶¶ 11-12. Because such a filing was not illegal, it was not impossible for FLAG to comply with its

-32-

contractual obligations. We show below that the doctrine of legal impossibility has no application to this case, and that FLAG was not excused from its obligation to perfect the security interest in the Taiwan Collateral in accordance with the laws of Taiwan.

<u>Argument</u>

POINT I

### FLAG'S FAILURE TO PERFECT THE SECURITY INTEREST IN THE TAIWAN COLLATERAL IS NOT EXCUSED BY THE DOCTRINE OF LEGAL IMPOSSIBILITY

The sole basis upon which the Bankruptcy Court granted FLAG's motion for summary judgment was that, in the opinion of the Bankruptcy Court, Taiwan law barred FLAG from complying with its contractual obligations and, accordingly, FLAG's failure to perform was excused by the doctrine of impossibility. As an initial matter, the Bankruptcy Court should not have even considered the issue of impossibility. Impossibility is an affirmative defense which, if not raised in a responsive pleading, is waived. *T.E.A.M. Entertainment, Inc. v. Douglas*, 361 F. Supp. 2d 362, 367 (S.D.N.Y. 2005). FLAG did not raise impossibility as a defense in either its First Amended Complaint or its Reply to the Elliott Defendants' Counterclaims. Indeed, FLAG did not raise the issue in its motion for summary judgment, and raised the issue only in passing in its Reply Memorandum of Law. *See* Reply Memorandum of Law in Support of FLAG's Motion for Summary Judgment as to FLAG's Amended Complaint and Elliott's Counter-Claims (Adv. ECF No. 109), pp. 5-6. Under the circumstances, it was reversible error for the Bankruptcy Court to hold that FLAG's performance was impossible under Taiwan law.

Even if FLAG had properly raised the affirmative defense of impossibility, there was no basis for that defense in either fact or law. The Bankruptcy Court's conclusion was based upon its erroneous assumption that the Alcatel Note and Security Agreement required FLAG to register the Security Agreement, as opposed to the security interest, in Taiwan, and that such registration was not permitted by Taiwan law. As set forth more fully above, the Bankruptcy Court misinterpreted the relevant contractual documents. FLAG was obliged to do more than register United States documents in Taiwan. Rather, FLAG was obliged to "take all actions to the maximum extent permitted by applicable law . . . reasonably necessary to ensure the legality, enforceability, validity and perfection of" the security interest in the Taiwan Collateral. Alcatel Note, § 5. Because, in order to perfect the security interest in the Taiwan Collateral in Taiwan, FLAG had to find and arrange for a Taiwan entity to make the necessary filings in Taiwan, those were the actions which FLAG had to take in order to comply with its contractual obligations. Because there was no legal impediment to prevent FLAG from taking these actions, the doctrine of legal impossibility has no application to this case.

Even if FLAG's performance were, in fact, impossible under Taiwan law, that fact would not, alone, warrant the entry of judgment in favor of FLAG. New York law applies the doctrine of impossibility narrowly and New York courts will vitiate a contract based upon impossibility only rarely. *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900 (1987); *Lagarenne v. Ingber*, 273 A.D.2d 735 (3d Dep't 2000). The general rule under New York law is that once a party has made a contract, that party must perform or respond in damages for its failure. *Comprehensive Bldg. Contractors, Inc. v. Pollard Excavating, Inc.*, 251 A.D.2d 951 (3d Dep't 1998). The doctrine of impossibility is generally applied

-34-

only where the means of performance of a contract is destroyed by an intervening act of God or change in law. *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275 (1968).

Significantly, the doctrine of impossibility is available only where the factor which renders performance impossible was unforeseeable at the time the contract was made. *Bank of America Nat'l Trust and Savings Assoc. v. Envases Venezolanos, S.A.*, 740 F. Supp. 260 (S.D.N.Y.), *aff'd*, 923 F.2d 843 (2d Cir. 1990). The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of the parties when they entered into the contract. *City of New York v. Local 333, Marine Division, Int'l Longshoreman's Assoc.*, 79 A.D.2d 410 (1st Dep't 1981), *aff'd*, 55 N.Y.2d 898 (1982). If the circumstance at issue could have been anticipated and provided for in the contract, the defense of impossibility will be unavailing. *VJK Prods., Inc. v. Friedman/Myer Prods., Inc.*, 565 F. Supp. 916 (S.D.N.Y. 1983); *Frenchman & Sweet, Inc. v. Philco Discount Corp.*, 21 A.D.2d 180 (4th Dep't 1964). Even an intervening change in law or government policy will not excuse performance if the change was foreseeable at the time the contract was made. *In the Matter of A&S Transp. Co. v. County of Nassau*, 154 A.D.2d 456 (2d Dep't 1989). Similarly, where performance is dependent upon some action by a government agency, delays by that agency will not excuse performance if the delay was foreseeable. *Navila v. Windsor Wolf Road Properties Co.*, 249 A.D.2d 658 (3d Dep't 1998); *Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 208 A.D.2d 1073 (3d Dep't 1994).

In this case, the Bankruptcy Court did not consider any of the factors relating to the law of impossibility. First, the Bankruptcy Court did not give any consideration as to whether the circumstances which purportedly rendered FLAG's performance impossible existed prior to the time the parties entered into the Alcatel Note. In fact, the relevant laws governing registration of a chattel mortgage in Taiwan date from August 19, 2000, over two years before the parties entered into the Alcatel Note. Lo Decl., ¶ 22. Second, the Bankruptcy Court did not give any consideration as to whether FLAG knew or should have known of the circumstances that purportedly made perfection in Taiwan difficult. In fact, the evidence shows that FLAG was well aware that perfection in Taiwan would be a cumbersome process. Thus, in negotiating the terms of the Alcatel Note, FLAG specifically asked Alcatel to waive any requirement that FLAG comply with the laws governing perfection of collateral in Asia. Although Alcatel rejected FLAG's request, Alcatel did agree to give FLAG until December 31, 2002, or approximately 12 weeks after the execution of the Alcatel Note, to comply with its perfection obligations. Alcatel Note, § 5. The fact that the parties agreed that FLAG would have so much time to perfect the security interest in the Asian collateral, and the fact that the December 31, 2002 with respect to the Taiwan Collateral deadline was extended twice, demonstrates that the parties clearly foresaw that the perfection process could be time-consuming. *See* Elliott Defs'. 7056-1 Statement, Exs. JJ-KK.

In holding that FLAG's performance of its obligations under the Alcatel Note and the Security Agreement were excused by the doctrine of impossibility, the Bankruptcy Court did not cite any relevant New York authority. Instead, the Bankruptcy Court relied on a misreading of two secondary authorities, Section 266 of the Second Restatement of

Contracts and *Corbin on Contracts*. The Bankruptcy Court held that impossibility excuses performance as long as the contracting party acts in good faith. Memorandum of Decision, pp. 13-14. There is no support in law or logic for this statement. To the contrary, the Second Restatement, like New York law, recognizes that the relevant inquiry is whether the contracting parties had reason to know of the circumstances which render performance impracticable:

> § 266  Existing Impracticability or Frustration
>
> (1)    Where, at the time a contract is made, a party's performance under it is impracticable without his fault ***because of a fact of which he has no reason to know*** and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 266 (1981) (emphasis added).

As far as *Corbin on Contracts* is concerned, that treatise, like New York law, recognizes that "Discharge does not come easily, and parties have been held to bargains that turn out to be harsh in retrospect." 14 *Corbin on Contracts*, § 74.1, p. 9 (2001). One of the key factors, according to *Corbin*, is whether the circumstances rendering performance impossible was foreseeable:

> In some circumstances the nonperforming party will be held liable even when performance is absolutely impossible, on the ground that the promisor assumed the risk of subsequent events disrupting expectations. While performance may be impossible, the payment of damages is not. Outcomes depend on how a court allocates the risks of disappointing post-contract developments.

*Id.*, p. 10.

-37-

In this case, the Bankruptcy Court held, without any rationale, that it was Alcatel and its assignees that assumed the risk that applicable law would not permit FLAG to perform its contractual obligations. Memorandum of Decision, p. 14. There is simply no basis in the record to support this conclusion. It was FLAG, not Alcatel, that agreed to "take all actions to the maximum extent permitted by applicable law" to perfect the security interest securing the Alcatel Note in accordance with the law of Taiwan. Alcatel Note, § 5. It was FLAG, not Alcatel, that agreed that failure to comply with Taiwan law would be "an Event of Default for all purposes" under the Alcatel Note. *Id.* It was FLAG that requested that Alcatel agree to remove any requirement that FLAG comply with Asian law, and acquiesced when Alcatel insisted that the requirement remain in the Alcatel Note. Elliott Defs'. 7056-1 Statement, Ex. DD. *See* FLAG 7056-1 Statement, Ex. F (Adv. ECF No. 71. In short, the language of the Alcatel Note and the record before the Bankruptcy Court demonstrate that FLAG was well aware that complying with Taiwan law could be difficult and was the only party that assumed any risk that compliance with Taiwan law would not be possible.

## POINT II

### EVEN IF FLAG WERE OBLIGED TO COMPLY WITH ONLY NEW YORK LAW, THE NEW YORK UCC REQUIRED FLAG TO PERFECT THE SECURITY INTEREST IN ACCORDANCE WITH THE LAWS OF IN TAIWAN

In moving for summary judgment, FLAG did not rely on the doctrine of impossibility, but, instead, argued that it fulfilled its contractual obligations when it filed UCC-1 financing statements in Washington, D.C. FLAG argued that New York law, not Asian law, governed its perfection obligations, that New York law required that financing

statements be filed in Washington, and that no filings were required in Asia. For the reasons set forth above, pp. 19-27, *supra*, FLAG's argument is contradicted by the language of the Alcatel Note and Security Agreement. Even if FLAG were correct, however, that FLAG's perfection obligations were governed exclusively by New York law, the New York Uniform Commercial Code required FLAG to perfect the security interest in the Taiwan Collateral in accordance with the laws of Taiwan.

Section 9-301(a) of the New York UCC provides:

> (a)    Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.

The default rule for the location of the debtor is contained in Section 9-307(b) as follows:

> (b)    Debtor's location:  general rules.  Except as otherwise provided in this section, the following rules determine a debtor's location.
>
> *                      *                      *
>
> (2)    A debtor that is an organization and has only one place of business is located at its place of business.
>
> (3)    A debtor that is an organization and has more than one place of business is located at its chief executive office.

It is undisputed that the Taiwan Collateral was owned by FLAG Telecom Taiwan Limited, which is a business located in Taipei, Taiwan. *See* FLAG 7056-1 Statement, Ex. G (Adv. ECF No. 71. Under the default rule, therefore, the law of Taiwan governed the perfection,

the effect of perfection or nonperfection, and the priority of the security interest in the Taiwan Collateral.

The only relevant limitation on this general rule is contained in Section 9-307(c) as follows:

> (c)     Limitation of applicability of subsection (b).  Subsection (b) applies only if a debtor's residence, place of business, or chief executive office, as applicable, is located in a jurisdiction whose law generally requires information concerning the existence of a nonpossesory security interest to be made generally available in a filing, recording, or registration system as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral.   If subsection (b) does not apply, the debtor is located in the District of Columbia.

As described in the Lo Declaration submitted by the Elliott Defendants below, Taiwan meets the requirements of UCC Section 9-307(c):

- In Taiwan, the registration of a non-possessory security interest in collateral is necessary in order to obtain priority over other lien creditors. Lo Decl., ¶8.

- Chattel mortgage registrations are used to perfect non-possessory security interests in collateral that is moveable property such as the Taiwan Collateral.  *Id.,* ¶9.

- Priority is determined according to the order of registration.  *Id.* ¶13.

- Under the Enforcement Rules of the Chattel Security Transaction Law a security interest in the Taiwan Collateral would be registered at the Industrial Development Bureau ("IDB") of the Ministry of Economic Affairs ("MOEA").  *Id.* ¶10.

- The registration procedure is simple and straightforward and should take effect within 1-2 days of filing. *Id.* ¶11.

- Non Taiwan entities may perfect security interests in Taiwan either by means of an assignment to a Taiwan individual or entity or through a trust relationship with a Taiwan individual or entity authorized to act as a trustee. *Id.* ¶12.

- A security interest could have been perfected in the entire Taiwan Collateral, although FLAG may have had to obtain a consent of a non-affiliate in order to perfect the security interest in the Cable Station Agreement or any other portion of the Taiwan Collateral that is jointly owned by FLAG and a non-FLAG entity. *Id.* ¶¶23-24; 7.

- A security interest could have been perfected in Taiwan in any portion of the Taiwan Collateral that is owned solely by FLAG without the need to obtain any other consent. *Id.* ¶24.

The Lo Declaration also makes clear that information concerning the existence of a non-possessory security interest in collateral such as the Taiwan Collateral is generally available:

- The chattel mortgage registration records, including at the IDB, are searchable. The search process is routine. *Id.* ¶14.

- The search procedure is simple and cost effective. *Id.* ¶15.

- Search results are available in three to five working days. *Id.* ¶15.

Lest there be any doubt regarding the system in Taiwan, the Lo Declaration makes clear that a chattel mortgage has actually been perfected in Taiwan against property similar to

-41-

the Taiwan Collateral. *Id.* ¶19. In that instance, it appears that a Taiwan bank acted as trustee for a foreign creditor or collateral agent. *Id.* ¶20.

As described in the Lo Declaration, not only does the system for perfecting non-possessory security interests in Taiwan meet the standard of New York UCC Section 9-307(c), but also a security interest in collateral similar to the Taiwan Collateral has in fact been perfected in Taiwan under that system. Lo Decl., ¶¶ 19-22, Ex. C. The security interest in the Taiwan Collateral should therefore have been perfected in Taiwan <u>even if</u> the parties had intended the New York UCC to control the location of that perfection.

Importantly, there have been no significant changes in the Taiwan law governing chattel mortgage registration since August 2000. *Id.*, ¶22. There were therefore no restrictions under Taiwan law which would have prohibited FLAG from registering a chattel mortgage against the Taiwan Collateral on or before July 30, 2003. *Id.* ¶22.

## Conclusion

For all the foregoing reasons, as well as those contained in the record below, FLAG's motion for summary judgment should have been denied in its entirety, and the Memorandum of Decision and Judgment of the Bankruptcy Court should be reversed. Indeed, for the reasons set forth above, in light of the fact that the Bankruptcy Court quite properly did not accept any of FLAG's legal arguments, it would have been appropriate for the Bankruptcy Court to have granted summary judgment in favor of the Elliott Defendants. At a minimum, on the record before the Bankruptcy Court, there are issues of fact as to whether the Alcatel Note required FLAG to comply with the perfection requirements imposed by Taiwan Law and, if the Alcatel Note did not impose that requirement, whether

Taiwan is a jurisdiction "whose law generally requires information concerning the existence of a nonpossessory security interest to be made generally available in a filing, recording or registration system as a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral" so that, under Section 9-307(c) of New York's Uniform Commercial Code, a security interest in collateral owned by a company located in Taiwan would have to be perfected pursuant to the law of Taiwan.

Dated: New York, New York
       July 6, 2005

                              KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.


                              By:_____/s/ Edward P. Grosz_____
                                       David Parker (DP-1075)
                                       Edward P. Grosz (EG-9120)

                              551 Fifth Avenue
                              New York, New York 10176
                              (212) 986-6000

                              Attorney for Defendants-Appellants
                              **KENSINGTON INTERNATIONAL, LTD.,
                              SPRINGFIELD ASSOCIATES, LLC, ELLIOTT
                              ASSOCIATES, L.P., and ELLIOTT
                              INTERNATIONAL, L.P.**

-43-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                                                :
                                                                      :
FLAG TELECOM HOLDINGS LIMITED, FLAG LIMITED,:
FLAG PACIFIC USA LIMITED, FLAG TELECOM GROUP:
SERVICES LIMITED, FLAG TELECOM USA LTD., FLAG:
ASIA LIMITED, FLAG ATLANTIC HOLDINGS LIMITED,:
FLAG ATLANTIC LIMITED, FLAG ATLANTIC USA:                    05 Civ. 05724 (NRB)
LIMITED                                                               :
                                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          AFFIDAVIT OF SERVICE
FLAG TELECOM GROUP LIMITED, FLAG ASIA LIMITED,  :
FLAG TELECOM ASIA LIMITED, FLAG TELECOM TAIWAN :
LIMITED and FLAG TELECOM JAPAN LIMITED          :
                                                                      :
                Plaintiffs-Appellees-Cross-Appellants,  :
                                                                      :
        v.                                                            :
                                                                      :
KENSINGTON INTERNATIONAL, LTD., SPRINGFIELD     :
ASSOCIATES, LLC, ELLIOTT ASSOCIATES, L.P. and   :
ELLIOTT INTERNATIONAL, L.P.,                    :
                                                                      :
                Defendants-Appellants-Cross-    :
                Appellees.                      :
                                                                      :
WILMINGTON TRUST COMPANY and THE BANK OF NEW:
YORK,                                                                 :
                                                                      :
                Defendants-Appellee.           :
                                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK  )

        SANDY GRANCARIC, being duly sworn, deposes and says:

        1.  I am not a party to the action, am over 18 years of age and reside in Queens County,

New York.

        2.  On July 6, 2005, I caused a true copy of the annexed Brief of Defendants-Appellants

Kensington International, Ltd., Springfield Associates, LLC, Elliott Associates, L.P. and Elliott

International, L.P. to be served by Federal Express mailing the same in a sealed Federal Express

envelope, with postage prepaid thereon, addressed to the last known address of the addressee as

indicated below:

                Craig H. Millet
                **GIBSON, DUNN & CRUTCHER LLP**
                Orange County Office
                4 Park Plaza, Suite 1700
                Irvine, CA 92614-8557
                Attorneys for Plaintiffs-Appellees
                **FLAG TELECOM GROUP LIMITED, et al.**

                Christopher Heisenberg
                **WINSTON & STRAWN, LLP**
                200 Park Avenue
                New York, New York 10166-4193
                Attorney for Defendant-Appellee
                **WILMINGTON TRUST COMPANY**

                Howard Rogatnick
                **BRYAN CAVE, LLP**
                1290 Avenue of the Americas
                New York, New York 10104-3300
                Attorney for Defendant-Appellee
                **THE BANK OF NEW YORK**

                *Sandy Grancaric*
                Sandy Grancaric

Sworn to before me this
6th day of July 2005

_____
Notary Public
**CYNTHIA WISE**
**Notary Public, State of New York**
**No. 01WI6098423**
**Qualified in New York County**
**Commission Expires September 08, 2007**